# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00661-CV

---

### B. C. and J. G. F., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY
### NO. 23-0120-CPSC1, THE HONORABLE BRANDY HALLFORD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

This is an accelerated appeal of the trial court's order terminating appellants Mother's and Father's parental rights to their two children—E.C. (born in 2021) and A.C. (born in 2022). Mother and Father contend that the trial court abused its discretion when it denied the Department's motion to extend the case—which had been filed pursuant to a mediated settlement agreement. Father additionally contends that the evidence is legally and factually insufficient to support the trial court's termination order based on Texas Family Code subsections 161.001(b)(1)(D), (E), and (O). We overrule Father's legal-sufficiency issues, decline to address his factual-sufficiency issues, sustain Mother's and Father's extension issue, reverse the trial court's order insofar as it terminated Mother's and Father's parental rights, and remand the case to the trial court for further proceedings consistent with this opinion.

## BACKGROUND

### *(a) Safety Plans*

The Texas Department of Family and Protective Services (the Department) became involved in this case in March 2023 after Mother was arrested for violating a protective order and assaulting Father by poking Father in the eye while the children were present. By that time, the Department was aware that Mother had assaulted Father before. In June 2021, while Mother was pregnant with E.C., Mother punched Father and split his lip. In December 2021, Mother punched Father twice, including once while Mother was holding E.C. Although Mother reported to Round Rock Police Officer Roberto Saucedo that Father swung at her first, Mother later conceded to Saucedo that she had lied. In February 2022, Mother was arrested for assaulting Father outdoors, while E.C. was indoors.

After Mother's March 2023 arrest, the Department secured a court order for Mother and Father to participate in counseling and domestic-violence prevention classes. Father complied but expressed confusion about why the Department became involved because the children had never been harmed during the incidents. The initial safety plan called for Mother's visits to be supervised and not by Father. In June 2023, the family violated the safety plan when Mother stopped by Father's house to pick up some money. In July 2023, the family again violated the safety plan when Father had Mother come over to his house to watch the children while he took a co-worker to the hospital for emergency medical care.

At a compliance hearing held on July 27, 2023, caseworker Megan McDaniel testified about the safety plan and the violations. Both Mother and Father testified and acknowledged their awareness of and need to comply with the safety plan. The Department adjusted the safety plan to require that 1) Father's visits be supervised as well and 2) a family

friend of Father's be the supervisor. But in August 2023, the family violated the new safety plan. First, Father told the family friend that she did not need to be at his house over the weekend because "[Child Protective Services] doesn't work on the weekends." The family was not then "open and honest about where the children were located." Second, Father had Mother take care of the children at the house by herself while Father went on a fishing trip. On cross-examination, McDaniel testified that, while she was on the case, the children "were doing well."

### (b) Department's Appointment as Temporary Managing Conservator

On August 15, 2023, the Department filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. On September 11, 2023, following an adversary hearing, the trial court appointed the Department the children's temporary managing conservator. In the service plans, the permanency goal was listed as Family Reunification by September 2024. The Department's concern was Mother and Father "being involved in a relationship involving intimate partner violence causing them to neglectfully supervise the children, placing the children in an unsafe and unstable environment." Meanwhile, the children were placed in kinship care, one when the case began, and then, in October of 2023, they were placed with a maternal aunt and uncle.

Mother's service plan required that she: maintain employment; maintain safe and stable housing; maintain contact with the Department; sign releases of information; participate in visitation; complete a psychological evaluation; participate in a nurturing parenting curriculum; participate in individual therapy; and participate in a Batterer's Intervention and Prevention Program (BIPP).

Father's service plan required that he: maintain employment; maintain contact with the Department; provide a safe and stable home; sign releases of information; participate in

3

visitation; complete a psychological evaluation and follow all recommendations; participate in and complete protective parenting; and participate in and complete individual counseling. A protective order was in place that did not prohibit contact between Mother and Father but prohibited Mother from making threats against Father.

Nevertheless, in March 2024, Mother was again arrested for assaulting Father. The two had met for dinner and drinks to celebrate their anniversary. Mother had come back to Father's house, the children were not in the house, and Father woke up to Mother assaulting him. Father called the police.

### (c) *Mediated Settlement Agreement to Seek Extension*

The clerk's record reflects that the trial court referred the case to mediation on April 25, 2024. Mediation was scheduled for and held on June 4, 2024. By that time, the trial court had scheduled a final hearing for June 10, 2024. After the mediation, the interested parties and advocates—Mother, Father, the Department's case worker Adriana Limon, and their three respective attorneys; the attorney ad litem for the children; and the court appointed special advocate for the children—signed a mediated settlement agreement. The parties and advocates agreed to just one objective: "to seek an extension of the [August 19, 2024] deadline in this cause at the permanency hearing scheduled on June 10, 2024" because it was "in the best interests of the children." *See* Tex. Fam. Code §§ 153.0071(d) (requirements to bind parties to MSA), 263.401(a) (requirement to dismiss case not timely resolved unless case extended). Consistent with that agreement, on June 6, 2024, the Department filed a motion for continuance and a motion asking the trial court to retain the case on its docket and set a new dismissal date of February 15, 2025. *See id*. § 263.401(b). The trial court moved the final hearing to July 15, 2024.

4

### (d) Denial of Motion to Extend and Final Hearing Testimony

The trial court called the case on July 15, 2024, with an interpreter present for the parents, and allowed the parties to argue in support of the motion. (These arguments are set out in detail below.) The trial court refused to extend the dismissal date and began the final hearing. The trial court resumed the final hearing on August 13, August 29, and September 18. The trial court heard from seven witnesses: 1. Department Caseworker Adriana Limon, 2. Mother, 3. Department Caseworker Megan McDaniel, 4. Williamson County CPS investigator Tanya Onwuazor, 5. Father, 6. CASA Angelica Ramos, and 7. Round Rock Police Officer Robert Saucedo.

#### 1. Department Caseworker Adriana Limon

On July 15, 2024, Department caseworker Adriana Limon testified that Mother met the requirements set by the Department because she: is "currently employed," has housing with her younger siblings, "continuously makes contact with the Department," signed releases of information, participates in supervised visitations with her children, completed a psychological evaluation in December of 2023, completed a nurturing parenting curriculum in December 2023, participated in and continued to participate in individual therapy, and was about half way through the BIPP, which she was scheduled to complete in November 2024. Reports from the program showed she had taken "accountability for her actions" and she "participate[d] actively." She also completed a drug and alcohol test that came back negative. Limon testified that although Mother was in compliance, "she has not addressed the reason that her children came into care" in part because of her delayed start of the BIPP.

Father met the requirements set by the Department because he: "continues to be employed," "actively maintained contact with the Department," "continues to reside at the

5

address where the removal came from," signed "releases of information," participates "in supervised visitations with his daughters" and the "visitations go well and he is very engaged with both girls," completed a psychological evaluation with recommendations for individual therapy and a parenting class, "participated in SAFE Alliance's fatherhood program," "participated in individual therapy from January 2024" and "was successfully discharged on June 11," and completed a hair-strand test that came back "negative" for drugs. Asked specifically if the therapist addressed the March 2024 incident with Father, Limon answered: "Yes," and the therapist said that Father "was open to discussing the history with his daughters and their mother, the reasons for engaging in that continued relationship." "He was able to identify the unhealthy factors in the relationship, and he reported to have made notable changes about when it relates to his thought process and those patterns of behavior."

Limon went on to discuss the instances of domestic violence against Father by Mother that led to the Department's involvement as well as the March 2024 incident, and the effect that domestic violence can have on children, causing "disconnect with parents, a lot of outbursts" and "behavioral issues." The Department was concerned specifically about E.C.'s behaviors—tantrums, biting, speech delays—and her sleep problems. The Department sought termination of Mother's and Father's parental rights because Mother and Father "continue to have contact" and "continue to participate in domestic violence." Mother had not discussed her triggers and Mother "continues to actively engage and participate in domestic violence." She also testified that appointing Father the children's managing conservator would impair their emotional and physical needs and that "because of the pattern that continues to present itself, the children would be at continued risk for that trauma."

Limon acknowledged that in her July 3 report, made just twelve days before, the primary permanency goal was relative conservatorship concurrent with family reunification. But since the Department had learned that the current kinship placement was not willing to continue, and the new kinship placement was not ready and not guaranteed, the Department could not at that point recommend something other than termination. When Mother's attorney asked Limon about the incongruity of the Department's representation in the mediated settlement agreement that an extension was in the children's best interest and its stance now that termination was in the children's best interest, the attorney for the Department objected on relevance grounds, and the trial court sustained the objection. Limon nevertheless testified that the girls were bonded with Mother and agreed it would be "detrimental" to them to have Mother's parental rights terminated. Limon stated that Mother was on track to finish all services by November.

On cross-examination by Father's attorney, Limon was asked, "do you believe this man's rights should be terminated?" Limon responded, "No." She acknowledged that Father could "get to the point where he can be successful with his children"; he was "wholeheartedly doing what the Department is asking him to do"; and he "would absolutely do whatever it takes to keep [termination] from happening." She reiterated that the alternative to termination, the kinship placement, was not set in stone. And "Should the kinship fail, then we would need to put them up for adoption."

Limon agreed that the planned kinship placement looked promising because she had met with the relatives, they had no prior criminal or Department history, and she believed the placement would be approved. She agreed that if the placement were approved "that placement could then have superior rights—conservatorship and [Father's] rights wouldn't have to be terminated." Limon admitted that until the day before, she was asking for conservatorship,

7

but now, at trial, she was asking for termination because "it was staffed with my superiors and that's the route that I was indicated to take." Limon stated this was because Father "continues to allow [Mother] access to his home and also, in a way, adding to the domestic violence between them." Father, therefore, had not provided a safe and stable home commensurate with what the Department wanted to see. She acknowledged that the incident in March was different from the prior incidents because the "kids were nowhere around," and that nothing else had happened since March. Limon agreed that if Father were to be awarded some type of conservatorship, there could be mechanisms in place to safeguard the children.

Pressed by the attorney ad litem, Limon stated that she did not think that Father could stay away from Mother. Limon also agreed that the children would not be safe if they were placed back with either parent today and that E.C. had been negatively impacted by the family violence. She acknowledged that both parents had provided child support to the current placement, but the current placement did not want to be a long-term placement; they had believed that the children would be returned to their parents.

Limon also acknowledged that both parents' visits with the children had gone "very well."

2. *Mother*

The trial court also heard from Mother, who acknowledged her several arrests, in 2022, 2023, and 2024, for assaulting Father. She could not explain her triggers. She said that she, not Father, had the idea to go out in March 2024 and acknowledged that she had been charged with a felony for the March 2024 incident. But she exercised her Fifth Amendment right not to testify at various points during her testimony, including when asked about the specifics of the March 2024 incident. She said she was on track to have the charge dismissed,

8

so long as she completed the Batterer's Intervention Prevention Program—a thirty-two-week program that she was about halfway through. She explained she delayed starting the program because of issues with communication and transportation.

Mother testified that she had learned through therapy to pay attention to body signals that identify emotional escalation. She denied that the domestic violence influenced the children because "they were pretty much isolated from the situations." But she acknowledged that the consequences that followed—her being arrested, and absent, and having to have supervised visits—had affected the children. Mother also reported that Father was arrested after he had punched her in the chest in February 2021, when she was pregnant with E.C. On cross-examination by her own attorney, Mother noted that she had completed "a psychological" and "a nurturing parenting class" and asked for more time to complete the BIPP. She stated that she was willing to do whatever it took to continue to be a part of the children's lives. On cross-examination by Father's attorney, Mother acknowledged that she had not told the truth about the February 2021 incident and that Father's case had been dismissed. She also acknowledged that she was pushy with Father in the past, and that her pushiness is what "got us to this point," but predicted that, in the future, she would be able to follow the guidelines she had ignored in the past.

### 3. Department Caseworker Megan McDaniel

Testimony continued August 13, 2024. Megan McDaniel, who had been the Family-Based Safety Services caseworker, testified about the court ordered services in the summer of 2023 and the family's violations of the safety plans, that had caused the Department to remove the children from Mother and Father's care. She said that although the parents said they were not together, it was "unclear to the Department" whether that was the case.

9

McDaniel's only concern with the parents was the domestic violence, and, in her opinion, neither parent took responsibility for the situation.

McDaniel also testified that, while she was on the case, the girls were doing well, and they were strongly bonded with both parents. She stated that Father made sure that the girls were fed, sheltered, and living in a home with utilities and that Father was able to get them to and from daycare while he worked. She acknowledged that if Father had difficulty understanding the translator, that would be a problem. But she did not think that any translation issue meant that he was unaware of the gravity of the situation—that violation of the family plan could result in removal. She said that, looking back at the case, she could see that Mother was the one trying to push herself onto the scene. The trial court questioned McDaniel about the violations of the safety plans. McDaniel confirmed that E.C. was at the home but asleep during some of the assaults.

### 4. CPS Investigator Tanya Onwuazor

Tanya Onwuazor, a CPS investigator in Williamson County, testified about the investigation of the March 2023 incident when Mother had poked Father in the eye—the one leading to court-ordered services. She agreed that, at the time, the children were being well taken care of by Father and that Father's home was appropriate.

### 5. Father

Father testified that in addition to E.C. and A.C., he has a teenage daughter who lives in Mexico and a pre-teen son who lives in Round Rock. He understood that E.C. and A.C. were removed from his care because he had agreed to let Mother see them when "she wasn't allowed to see them." He repeatedly mentioned his desire to help her, and to understand what it

10

was in her background that made her act the way she was acting. Father testified that once she became a mother, "there was a lot of stress around her and she wasn't able to control herself." Mother would blow up, realize she didn't know what she was doing, and accept that she was in the wrong. He said that they talked about "things that she had gone through and suffered when she was a child."

He described the March 2024 incident that occurred when the children were not in the house, saying he "was dead asleep when she started hitting me." When he saw she was "really committed to doing what she was going to do," he called the police. He left the house and went out into the street to keep anything else from happening. He said that prior to that assault, the evening had been "very quiet and peaceful." Father said that except for the time when Mother assaulted him while holding one of their girls, the girls were asleep during the assaults. "And even the police officers could see that, yes, they were asleep in their beds."

He described what he had learned in therapy, including that Mother's turns to violence weren't because of their arguments but rather because "there was a person who needed help." He said he had also learned navigation skills and the need for clearer communication. He said he was trying to bring his parents over from Mexico to help him raise the girls. He acknowledged that the children should not be around Mother without supervision. He said that the only time he had hit Mother was when he was defending himself. He said he had talked to his therapist about the March 2024 incident and learned that people in recovery, like Mother, can relapse. Asked about Mother's pattern of domestic violence, Father testified, "Well, now, like I said, again, I believe my chances for helping her are gone. I've spent— I've used up all of the chances to help her, but now it's— she is just being irresponsible." He continued, "And that's on

her.  But I believe that's not going to happen anymore.  There is not going to be another chance for that.  And there could be a plan in which she could be able to see her girls but [safely]."

He explained that before, when he would give in to her, it was because their oldest, E.C., "was constantly asking me about her mom."

On August 29, 2024, the trial court again heard from Father.  On cross-examination by his own attorney, Father testified that he has a three-bedroom home with two bathrooms.  He works in remodeling and has worked for the same company for several years.  He said he misunderstood the stakes at first—in part because of the language barrier.  He explained that he met up with Mother in March 2024 because she had done a lot of therapeutic work and he thought that it had worked, and he wanted to help her complete her services.  He had put his efforts into helping Mother when he should have been putting them into protecting his girls.  Now, he would put all his attentions and efforts on the children.  He said, "I learned that an excess of empathy—it is very bad—would be really bad and could damage your children."  He asked the trial court not to terminate his rights because "it would affect my daughters tremendously.  They're constantly asking me, 'When are we going home?'"  And his son was asking, "When am I going to be able to go to school with them?"

Asked by the attorney ad litem for the children about his violations of the safety plan, Father said that the safety plan was "a paper that was in English and I didn't understand very much of it."  He also said that he "never took the girls to see or to be with their mom.  She was the one that kept insisting and showing up to see the girls without my consent."  "She was being very obstinate and she didn't want to leave the home."  He said when he would let the girls see Mother it was because he "was trying to keep the peace and appease her so that the girls wouldn't see or wouldn't notice that anything was abnormal[.]"  And he was trying to "appease

my daughters because" when they "knew their mom was right outside the home," they wanted to see her. He testified that he knows now that he was not acting in the children's best interest, but he initially did not understand the rules and "communication with the Department—it's very difficult." The trial court then went over the timeline of the case with Father.

6. *CASA Angelica Ramos*

Next the trial court heard from Angelica Ramos, the court appointed special advocate volunteer who had worked the case since August 2023. She testified that Mother had completed all but the BIPP services, which she would complete in November; Father "has been very good at all of his services" but she still thought that termination was in the children's best interest. She stated that, "Previously we were asking for family reunification with a concurrent plan for family placement, family PMC. Without an extension on this case, I don't think today either parent can provide a safe home." She testified that if the trial court were to order custody or conservatorship to the aunt and uncle, she "would like to see shared rights for the parents," with supervised visits. She agreed that prior to starting the final hearing, CASA's opinion was that an extension in this case was in the best interest of the children.

On cross-examination from the parents' attorneys, Ramos testified that: termination of either parent's rights would negatively affect the children; she had no concerns about Mother's parenting if the parents were not together; she believed Father to be sincere in his testimony; and Father has a really strong relationship with his daughters. She testified that Father was "Very interactive with the girls at supervised visits. They love him. All over him. Sit and talk. And, of course, the girls tend to be upset when the meetings are over or the visits are over." And on cross-examination from the attorney ad litem for the children, Ramos testified

13

that there had been no incidents since March 2024, but that she "would like a little bit more time to see [Father's protectiveness.]"

After the CASA's testimony, the parties rested. But the trial court wanted to hear from Robert Saucedo, the Round Rock Police Officer who investigated the October 2021 incident. And it heard his testimony at the next setting.

### 7. *Round Rock Police Officer Robert Saucedo*

On September 18, 2024, the Department called Saucedo, and he testified that in October 2021, Father reported that he was assaulted by Mother as he was trying to leave for work. Mother grabbed him by the arm while she was holding then six-month-old E.C. Father began recording the altercation with his cell phone. She tried to grab the cell phone but could not, so she put E.C. down and began punching Father. The video captured Mother choking Father. Father provided the video to Saucedo and told him about another altercation in which Mother was the predominate aggressor. The video was played for the trial court. Mother told Saucedo that Father pushed her while she was holding E.C. when they were arguing, and it escalated from there. Saucedo had confronted Mother with the video, and she admitted assaulting Father. Saucedo characterized Father as the victim. The parties again rested and gave closing arguments, and the trial court took the case under advisement.

### (e) *Court's Exhibit 1 and Termination*

The trial court recalled the case on October 11, 2024, and sua sponte reopened the evidence to admit Court's Exhibit Number 1, reporter record excerpts from the compliance review hearing held on July 27, 2023. The trial court found by clear and convincing evidence that Mother and Father had exposed the children to a dangerous environment and

14

dangerous conduct and failed to comply with the provisions of their court orders. Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). The trial court further found by clear and convincing evidence that termination of Mother's and Father's rights was in the children's best interest. *See id*. § 161.001(b)(2). Mother and Father appealed.

## ANALYSIS

### *Legal Sufficiency*

We first address Father's complaints about the legal sufficiency of the evidence to support the predicate findings. *See United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 483 (Tex. 2017) (appellate court should first address issues that would afford party greatest relief); *In re L.N.C.*, 573 S.W.3d 309, 315 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) ("Because a finding of legal insufficiency would result in greater relief, we must first address Father's claims of legal insufficiency.").

### *Applicable Law and Standard of Review*

"A parent's fundamental right to the care, custody, and control of his child is of constitutional magnitude." *In re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022). A trial court may terminate a parent's right to his child if it finds by clear and convincing evidence both that (1) the parent committed a predicate act prohibited under section 161.001(b)(1), and (2) termination is in the child's best interest. Tex. Fam. Code § 161.001(b)(1), (2). Clear and convincing evidence is evidence of a measure or degree that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id*. § 101.007.

"This heightened burden of proof affects the standard of review in an evidentiary challenge on appeal." *In re J.W.*, 645 S.W.3d at 741. "To that end, in reviewing a legal-

15

sufficiency challenge, we must determine whether 'a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'" *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). Mindful of the required appellate deference to the factfinder, we "look at all the evidence in the light most favorable to the finding," "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.F.C.*, 96 S.W.3d at 266. However, we may not disregard "undisputed facts that do not support the finding." *Id.* Under this standard, the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

### *Legal Sufficiency of Predicate Findings Supporting Termination of Father's Rights*

Father complains that the evidence is legally insufficient to support the trial court's finding, by clear and convincing evidence, that Father

- (D) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;

- (E) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children; or

- (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children.

Tex. Fam. Code § 161.001(b)(1)(D), (E), (O).

16

*Application*

Only one predicate ground is necessary to support a judgment for termination, but due process mandates that we address Father's sufficiency challenges to Subsections (D) and (E), the endangerment grounds, because termination of a parent's rights under either can serve as a ground for termination of his rights to another child. *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019); Tex. Fam. Code § 161.001(b)(1)(M).

To endanger children is to expose the children to loss or injury. *In re J.W.*, 645 S.W.3d at 748. Endanger means more than a threat of or possibility of injury. But children may be endangered even if the offending conduct is not directed at them, and they are not injured. *Id.*

Subsection (D) focuses on environment and may be utilized as a ground for termination when the parent has caused a child to be placed or remain in an endangering environment. Tex. Fam. Code § 161.001(b)(1)(D). The relevant time frame for evaluating this ground is before the child's removal because the relevant question is whether the environment itself causes the child's physical or emotional well-being to be endangered; conditions or surroundings cannot endanger a child unless that child is exposed to them. *See In re J.W.*, 645 S.W.3d at 749. "The suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a Subsection (D) inquiry." *Id.*

Subsection (E) focuses on conduct and may be utilized as a ground for termination when the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's physical or emotional well-being[.]" *In re*

17

*R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024).  To determine that course of conduct, we look at the time before and after removal.  *In re J.O.A.*, 283 S.W.3d at 345.

Father argues that the children's exposure to domestic violence is insufficient to support grounds (D) and (E) because, rather than engaging in voluntary acts of endangerment, he was the victim of assaults by the children's Mother.  The Department argues that the trial court was entitled to find that the children were victims due to Father's failure to protect them from exposure to the assaults.  We agree with the Department that the evidence supports the trial court's findings of endangerment under Subsections (D) (the endangering environment) and (E) (the parent's course of endangering conduct).

It showed that Mother repeatedly assaulted Father while the children were in the home, and at least once, while Mother was holding E.C.  Mother also assaulted Father after the children were removed.  Mother was arrested for some of the assaults, including the March 2024 incident, which resulted in a felony charge.  Father testified he had called the police on Mother "around six times."  Father testified, "I remember the last time.  I remember the time that she poked my eye.  I remember the one time that she busted my lip and broke my phone.  And I remember another time that she busted my lip, but that one is not on the record."  Such "[p]hysical violence in the home leads to an unstable and unpredictable environment for children."  *In re M.L.L.*, 573 S.W.3d 353, 361 (Tex. App.—El Paso 2019, no pet.); *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.).  Here, Father was aware of Mother's issues but repeatedly allowed Mother to have unsupervised visits with the children.  McDaniel testified that each of those acts violated the safety plan, and that Mother and Father were aware of the safety plan.  Although Father testified that he had trouble understanding parts of the safety plan, the trial court could, as the sole arbiter of the witnesses' credibility and

demeanor, credit McDaniel's testimony over Father's. *See In re J.O.A.*, 283 S.W.3d at 346. After Father's transgressions on that front, another safety plan required his visits to be supervised as well, but Father violated that plan by, among other things, asking his supervising friend to leave for the weekend. *See id.* (irresponsible choices inform endangerment determination).

Limon testified that because of exposure to domestic violence, children can have behavioral issues. And E.C. did. The Department was concerned about her tantrums, biting, speech delays, and sleep problems. *See In re O.E.R.*, 573 S.W.3d 896, 906 (Tex. App.—El Paso 2019, no pet.) (parent's choice to continue romantic relationship that exposed child to domestic violence resulting in traumatic emotional harm to child supported environmental endangerment predicate). We conclude that this evidence of Mother's repeated assaults, and Father's failure to remove himself and his children from that violent relationship supports the endangerment finding under Subsection D. *See In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.).

This evidence also shows a course of endangering conduct, which supports termination under Subsection E. *In re J.F.-G.*, 627 S.W.3d 304, 314 (Tex. 2021); *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (considering fact that mother exposed child to domestic violence, including incident during which mother was "smacked" in front of child, as evidence of endangerment under Subsection E). It is the course of conduct, the repeated failure to protect the children, that concerned the caseworkers for the Department, the attorney ad litem, and CASA. All thought that, considering the March 2024 incident, Father's course of conduct had not changed enough that he could provide a safe home at the time of the final hearing. *See In re S.L.L.*, No. 13-19-00442-CV, 2020 WL 103862, at *6 (Tex. App.—Corpus Christi–Edinburg Jan. 9, 2020, no pet.) (mem. op.) ("Evidence of Father's erratic and

19

violent behavior, combined with Mother's persistent willingness to tolerate and excuse such behavior, also supports the endangerment finding.").

We note that this is not a case where Mother broke into Father's house to assault Father. *Cf.*, *In re M.G.P.*, No. 02-11-00038-CV, 2011 WL 6415168, at *11 (Tex. App.—Fort Worth Dec. 22, 2011, pet. denied) (mem. op.) (evidence on endangerment legally insufficient where mother tried to get away from abusive boyfriend, but boyfriend had kicked in door to get to mother). Nor is it a case where the children never witnessed the violence. *Cf.*, *In re A.S.*, 261 S.W.3d 76, 86 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (evidence insufficient to support endangerment finding where it was uncontroverted that children did not witness two occasions of domestic violence). Rather, as detailed above, Father testified that he allowed Mother into the house despite the safety plans, and Father admitted that E.C. was present and in Mother's arms during one of the assaults.

After considering the evidence in the light most favorable to the trial court's findings, we conclude the evidence is legally sufficient to support the trial court's findings, by clear and convincing evidence, that Father knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children, and engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. Tex. Fam. Code § 161.001(b)(1)(D), (E).

We overrule Father's first issue to the extent it challenges the legal sufficiency of the evidence. We next bypass Father's factual sufficiency complaints and turn to Mother and Father's complaint about the trial court's failure to extend the case, since it will afford him the same relief as the issue we address below. *See* Tex. R. App. P. 47.1.

### Trial Court's Failure To Extend The Case

Mother and Father assert that the trial court abused its discretion when it denied the Department's request to extend the automatic dismissal date, given the parties' mediated settlement agreement agreeing an extension was in the best interest of the children. Tex. Fam. Code §§ 153.0071, 263.401(b). We agree.

### Applicable Law and Standard of Review

The Legislature has directed courts to resolve certain suits affecting the parent-child relationship promptly or they lose jurisdiction automatically. *In re J.S.*, 670 S.W.3d 591, 593 (Tex. 2023). Specifically, a trial on the merits must commence by "the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator." Tex. Fam. Code § 263.401(a). The failure to comply with this deadline without a valid subsection (b) extension deprives the trial court of jurisdiction over the suit, and results in its automatic dismissal. *Id*. Section 263.401(b) permits the trial court to retain the suit on its docket only if the trial court finds that: (1) extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the Department; and (2) continuing the appointment of the Department as temporary managing conservator is in the best interest of the child. *Id*. § 263.401(b). Section 263.401(b-3) requires the trial court to find extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the Department if: "(1) a parent of a child has made a good faith effort to successfully complete the service plan but needs additional time; and (2) on completion of the service plan the court intends to order the child returned to the parent." *Id*. § 263.401(b-3).

We review a trial court's decision to grant or deny a request for an extension under Section 263.401(b) for an abuse of discretion. *See In re A.J.M.*, 375 S.W.3d 599, 604

21

(Tex. App.—Fort Worth 2012, pet. denied); *S. B. v. Texas Dep't of Fam. & Protective Servs*, No. 03-22-00476-CV, 2023 WL 402206, at *3 (Tex. App.—Austin Jan. 26, 2023, no pet.) (mem. op.). A trial court abuses its discretion when it acts arbitrarily and unreasonably, or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

## *Application*

Mother and Father argue that because the parties entered a mediated settlement agreement in which they agreed that an extension of the case was in the children's best interest, the trial court abused its discretion in not granting the motion for an extension. Under the Texas Family Code, a mediated settlement agreement is binding on the parties if it (1) emphasizes the agreement is not subject to revocation; (2) is signed by each party; and (3) is signed by each party's attorney. Tex. Fam. Code § 153.0071(d). If a mediated settlement agreement meets those requirements, "a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law." *Id*. § 153.0071(e). A trial court may not, for instance, deny a motion to enter judgment on a properly executed MSA under section 153.0071 based on a broad best interest inquiry. *In re Lee*, 411 S.W.3d 445, 458 (Tex. 2013) (orig. proceeding). Rather, trial courts "have other statutorily endorsed methods by which to protect children from harm without eviscerating section 153.0071(e)'s mandatory language or reading language into the statute under the guise of 'interpreting' it." *Id*. As provided in another subsection, a trial court may decline to enter a judgment on a mediated settlement agreement if it finds (1) "that a party to the agreement was a victim of family violence, and that circumstance impaired the party's ability to make decisions;"

22

and (2) "the agreement is not in the child's best interest." Tex. Fam. Code § 153.0071(e–1)(1)(A), (2).

Father complains that the trial court did not make the required findings. But the parties, in the mediated settlement agreement, agreed to *seek* an extension and agreed that an extension was in the best interest of the children. Here, the trial court referred the suit to mediation, *see id*. § 153.0071(c), and the parties, through mediation, bound themselves together to seek an extension which they agreed was in the best interest of the children. *See id*. § 153.0071(d). They did not thereafter seek a "judgment" on the mediated settlement agreement *See id*. § 153.0071(e). Nor could the parties have sought a "judgment" on the mediated settlement agreement; nothing in the parties' MSA involved an agreement with respect to the issues before the trial court for final resolution. *See In re L.J.*, No. 05-12-01283-CV, 2013 WL 1281882, at *3 (Tex. App.—Dallas Mar. 18, 2013, pet. denied) (mem. op.) ("Our review of the agreement shows there is nothing in the purported settlement upon which appellant's counsel could have sought a final judgment because nothing in the parties' settlement involved an agreement with respect to the issues before the trial court for final resolution, i.e., custody, placement, guardianship, or parental rights."); *Cf., In re Lee*, 411 S.W.3d at 447; *In re A.E.*, 580 S.W.3d 211, 214 (Tex. App.—Tyler 2019, pet. denied) (Department entitled to judgment on MSA—covering service plans, conditions for dismissal, and conditions for appointment of non-parents as joint managing conservators and parents as possessory conservators—given compliance with Section 153.0071(d)); *In re A.L.D.-B.*, No. 05-22-00277-CV, 2022 WL 3584629, at *2 (Tex. App.—Dallas Aug. 22, 2022, no pet.) (mem. op.) (parties entitled to judgment on MSA—that provided for termination based on Section 16l.001(b)(1)(O) and best interest and no other grounds—given compliance with Section 153.0071(d)).

And that makes sense; the parties cannot extend the deadlines set by a trial court under Section 263.401 "by agreement or otherwise." Tex. Fam. Code § 263.402. Even if the parties could themselves extend the deadlines by an MSA (given the "notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law" language in section 153.0071(e)), the parties here did not agree to extend the deadlines; they simply agreed to *seek* to extend them.

We therefore address the underlying complaint that the trial court abused its discretion in failing to grant the extension under section 263.401(b). *See In re Z.M.M.*, 577 S.W.3d 541, 542–43 (Tex. 2019) ("Courts must broadly construe issues to reach all core and substantive questions such that the merits of an appeal are addressed when reasonably possible to provide the party with a meaningful appeal.").

The Department's agreed motion for extension alleged (1) extraordinary circumstances necessitate the children remaining in the temporary managing conservatorship of the Department; and (2) continuing that conservatorship is in the best interest of the children. *See* Tex. Fam. Code § 263.401(b). Again, it asked that the trial court retain the suit on its docket and set a new dismissal date of February 15, 2025. The trial court heard arguments on the motion before starting the final hearing. Counsel for the Department argued:

> The Department's asking to retain the suit on the court's docket to give the parents the time needed to finish their services so we can try to reunify the children with the parents, if possible, and also to explore a placement change that will change the permanency options for the children—namely, who could be possibly the conservator or if it needs to be the adoptive placement, if that's necessary. This will be per our mediated settlement agreement from June 4th of 2024 where the parties agreed to request the Court to order an extension in the deadline of this case.
>
> There was an incident in March—a domestic violence incident where the mother was arrested, and that criminal case is still pending. However, the evidence will show that there is no continued incidents since then and that the parents have been in compliance with their therapy and other services since then.

24

I guess we're asking for the dismissal date to be extended to February 15, 2025, and then trial dates be set midway as well as closer to the deadline for November-December time frame in order to keep the case moving.

Counsel for Mother stated Mother agreed with the request. Counsel for Father argued:

Judge, although I feel my client's done adequate in his services, I feel that this new hiccup that happened in March—which is a huge hiccup, the fact that he is the victim and we're still going back and forth. I think there needs to be more accountability on his behalf. I think he knows that. Obviously he feels he's done all his services, and he feels that he's in a good position. But I know the Court's reservation. That's why we agree to more time, Your Honor—to prove to the Court that he understands the impact that this can have on the children. And for those reasons, Judge—not because I don't feel my client has done adequate, but because I think we need to prove more to the Court—that's why we're asking for this continuance.

And the attorney ad litem for the children argued

Our main concern and why we believe this is—we're in agreement with this extension is also the placement issue. Placement issue is very important because, you know, it affects the children. We want to see them in a stable place. They are doing a home study on someone. We would like to see that come through. And also that would also allow—if it is a good home study and [the paternal aunt] passes, allow her to have the options necessary to make sure that she gets whatever assistance that she may need if she ends up being the permanent placement for these children.

The trial court then stated, "At the last permanency hearing in April the Court was informed of the new felony arrest and that the mother was -- respondent mother was under bond conditions. So what has changed since then? That was April, now we're in July." Counsel for the Department answered:

So one of the major issues would be the placement change that's needed, but, I guess, the thing that not necessarily changed but the thing that has shown progress

25

on has been the progress and services, especially for the respondent father in addressing the domestic violence incident from March in his therapy, and then possibly being able to continue to offer other services to address that issue as needed. Some of the things is just showing stability over time would also be necessary in this case in order to ensure that the parents are complying with their domestic violence safety plans.

The trial court requested testimony from the Department caseworker Adriana Limon "on the placement element." Limon testified:

So in about June the current placement informed me that, if the Department were to ask for an extension, that they would be unable to keep the girls past August and they were no longer willing to care for the girls. They are not willing to be a long-term placement for them should that be necessary if they were not returned to parents.

The trial court denied the motion, finding that continuing the case was "not in the best interest of the children."

THE COURT: This case originated as a petition for temporary orders to participate in services. That was filed on May 3rd, 2023. Temporary orders were granted on May 17, 2023. There were multiple compliance hearings held and the same issues that brought the Department to originally investigate the case— request Family-Based Safety Services and then having to come to the Court to get the parents ordered to participate in services—those underlined issues continued to occur.

The Department made a lot of reasonable efforts to avoid the children coming into the care of the Department of Family and Protective Services, but unfortunately they had to request emergency removal of the children on August 15, 2023. And the year—dismissal date is August 19, 2024. From all the hearings held in this court on permanency hearings, the underlying issues continue to occur with little to no improvement as far as the parents' participation in Family-Based Safety Services to alleviate the safety concerns.

The Court finds that continuing this case is not in the best interest of the children. I'm going to deny the motion for continuance.

26

As can be seen from the above, all the interested parties believed an extension of the case was in the best interest of the children; no witness testified against the extension and no attorney argued against the extension. *Cf.*, *In re A.J.M.*, 375 S.W.3d at 605 (children's ad litem attorney argued against extension); *In re of K-A.B.M.*, 551 S.W.3d 275, 284 (Tex. App.—El Paso 2018, no pet.) (Department objected to mother's request for continuance); *In re Y.G.*, No. 01-22-00181-CV, 2022 WL 3362953, at *7 (Tex. App.—Houston [1st Dist.] Aug. 16, 2022, pet. denied) (mem. op.) (attorney ad litem and Department were opposed to extending dismissal date and argued that parents had "had ample opportunities to work their services" and had failed to make good-faith efforts to complete them).

The extraordinary circumstances identified by the Department included 1) the progress of the parents and Father specifically in addressing the domestic violence incident in March and the desire of the interested parties to see if each parent could provide a safe and stable home over time; and 2) completion of the home study for the paternal aunt and uncle in McAllen, necessary because the maternal aunt and uncle in Del Valle had just announced they were not willing to keep the girls past August. These circumstances bear no resemblance to those courts have rejected as warranting an extension or continuance—such as the parent being incarcerated, entering rehab, or beginning the service plan too late to complete requirements prior to trial. *See In re M.K.V.*, 648 S.W.3d 478, 483 (Tex. App.—San Antonio 2021, no pet.) (collecting cases); *see In re X.M.B.E.*, 706 S.W. 3d 714, 723–24 (Tex. App.—Eastland 2025, no pet. h.) (noting "a parent's obstinance, apathy, intentional delay, or outright refusal to engage in services is the antithesis of a 'good faith effort'").

Mother and Father did not wait to begin complying with their service plans until several weeks before trial; Limon testified that Mother had completed or was striving to

complete all services assigned to her and Father needed only show he could provide a safe and stable home. *Cf.*, *In re O.R.F.*, 417 S.W.3d 24, 42 (Tex. App.—Texarkana 2013, pet. denied); *In re L.C.W.*, 411 S.W.3d 116, 124 (Tex. App.—El Paso 2013, no pet.). Mother and Father did not need time to complete drug treatment; their drug tests came back clean. *Cf.*, *In re J.S.S.*, 594 S.W.3d 493, 501 (Tex. App.—Waco 2019, pet. denied). Mother and Father did not avoid the Department; both maintained communication with the Department. *Cf.*, *In re L.C.W.*, 411 S.W.3d at 124. The undisputed testimony was that Mother and Father's visits with the children were appropriate; "the visitations go well" and both Mother and Father are bonded with the children. Limon testified that termination would be detrimental because of those bonds. Limon testified that there were not concerns about either Mother's or Father's parenting ability—at least when they were not together. *Cf.*, *In re A.J.M.*, 375 S.W.3d at 605. Not only are the circumstances in this case different in kind from those found not to be "extraordinary," the evidence was undisputed that Mother and Father made good faith efforts to complete their service plans, and those good faith efforts put subsection 263.401(b-3) in play. *In re J.S.*, 670 S.W.3d at 599–600 (noting trial courts must abide by mandatory language in subsection (b-3)).

Given the good faith efforts, under subsection 263.401(b-3), the trial court was required to find extraordinary circumstances so long as it had expressed a clear intention to return the children to Mother and Father upon Mother and Father's completion of their service plan requirements. It had. In the Agreed Temporary Order Following Adversary Hearing signed on September 11, 2023, the trial court set out the service plan, noting each of the actions required "are necessary to obtain the return of the children, and failure to fully comply with these orders may result in the restriction or termination of parental rights."

28

In the Status Hearing Order signed on October 11, 2023, the trial court found that "the goal of the service plans is to return the children to the parent(s), and the plans adequately ensure that reasonable efforts are being made to enable the parent(s) to provide a safe environment for the children," and "the plans are reasonably tailored to address any specific issues identified by the Department."

And, in the Permanency Hearing Order Before Final Order signed February 13, 2024, the trial court found each parent "is in compliance with court-ordered services, and is currently engaged in services, but has not yet completed the services required." The trial court further found that it had "reviewed the appropriateness of the primary and alternate permanency goals" for the children and found that the "primary permanency goal" is "family reunification and the concurrent permanency goal is relative adoption."

Here, the record shows that (1) Mother and Father made a "good faith effort" to comply with and complete their service plans, but each needed additional time to do so, and (2) the trial court intended to return the children to Mother and Father upon the completion of their service plans. Tex. Fam. Code § 263.401(b-3)(1), (2). Therefore, the trial court was required to find extraordinary circumstances. *See In re X.M.B.E.*, 706 S.W.3d at 724–25.

This brings us to the second requirement for a subsection 263.401(b) extension: that it be in the best interest of the children—and, as detailed above, all interested parties swore that it was. The trial court, in finding otherwise, stated that "the underlying issues continue to occur with little to no improvement as far as the parents' participation in Family-Based Safety Services to alleviate the safety concerns." But the Department's counsel reported the opposite. In arguing for the extension, she recognized the "incident in March," but she told the trial court that the Department's evidence "will show that there [are] no continued incidents since then and

that the parents have been in compliance with their therapy and other services since then." She specifically noted that Father had shown progress in addressing the domestic violence incident from March in his therapy. And true to those representations, the trial evidence showed Mother's and Father's nearly complete compliance with their service plans. The only complaint against Mother and Father that occurred after the children were placed with the Department was Mother's March 2024 assault against Father—outside the presence of the children. Some witnesses at trial, including the caseworker and the CASA, qualified their testimony recommending termination as related to the denial of the extension. Here, Mother and Father actively pursued and participated in services both before and after the March 2024 incident. The Department wanted to make sure the paternal kinship placement would work out, so that it could do something other than terminate the parent's rights and put the children up for adoption.

Mother and Father's rights to the companionship, care, custody, and management of their children are constitutional interests "far more precious than any property right." *See Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982). "[I]nvoluntary termination statutes" should be "strictly construed in favor of the parent." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Here, the Department, in seeking an extension, sought to continue to limit Mother and Father's parental rights, but not to erase them permanently. We hold the trial court abused its discretion in refusing to grant the extension that all interested parties, up until the moment that the final hearing started, judged was in the children's best interest. *See In re A.P.*, 672 S.W.3d 132, 137 (Tex. 2023) (Young, J., concurring) (noting courts ought to be "wary of standards, or the application of standards, that disproportionately affect victims of domestic violence and such victims' children").

Because the trial court's error deprived Mother and Father of the chance to prove they could each provide a safe and stable home for the children, we also hold that the trial court's abuse of discretion (1) probably caused the rendition of an improper judgment; or (2) probably prevented Mother and Father from properly presenting the case to this court. *See* Tex. R. App. P. 44.1. Our holding does not alter the trial court's appointment of the Department as E.C. and A.C.'s managing conservator. *See In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007) (unchallenged appointment of nonparent conservator was not affected by reversal of termination judgment). Accordingly, we sustain Mother and Father's extension issue.

## CONCLUSION

We sustain Mother and Father's extension issue, reverse the trial court's order insofar as it terminated Mother and Father's parental rights, and remand the case to the trial court for further proceedings consistent with this opinion. Any proceedings on remand must be commenced within 180 days of this court's mandate. Tex. R. App. P. 28.4(c).

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Reversed and Remanded

Filed: April 11, 2025

31